**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BART BOKANOSKI | : | CIVIL ACTION NO. |
| ROBERT DIZINNO, and | : | 3:15-cv-00021-JCH |
| JEREMY ANDERSON, | : | |
| on behalf of themselves and all | : | |
| others similarly situated, | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| v. | : | |
| | : | |
| LEPAGE BAKERIES PARK ST., LLC, | : | |
| C.K. SALES CO., LLC, | : | |
| | : | |
| DEFENDANTS. | : | March 7, 2017 |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND RESPONSE TO OBJECTION**

Plaintiffs Bart Bokanoski, Robert Dizinno, and Jeremy Anderson seek final approval of a

class action settlement agreement and release ("Settlement Agreement," ECF Doc. 116-2)

entered into between the Parties in this action.  The proposed settlement creates a $1,250,000

settlement fund to be distributed between 36 possible class members.  After reduction for the

proposed awards of attorneys' fees and costs, and incentive payments to the named Plaintiffs, a

net fund of $796,313 will be distributed to the 35 participating class members,[1] with the average

"pay-out" to a participating class member of approximately $22,750.  Further, all of the class

members who currently own distributorships will be given the option of selling their "territories"

---

[1] There are 36 class members. One class member has opted out of the settlement because he previously retained his own counsel and he is pursuing claims individually in Massachusetts, as he performed much of his work in that state. See Donovan v. Lepage Bakeries, et al., D. Mass. No. 16-3100. Remarkably, the remaining 35 class members have submitted claim forms expressing their intent to participate in and be bound by the settlement.  At the time that the Parties moved for preliminary approval of the settlement, they inadvertently stated that there were only 35 class members.

back to Defendants[2] for an amount significantly above what they might otherwise receive from the sale of such distributorships,[3] resulting in the additional benefit of potentially tens of thousands of dollars to class members who choose to end their relationship with Defendants as part of the proposed settlement. In addition, the settlement provides class members who continue to own distributorships with an alternative dispute resolution (ADR) program, for which Defendants have agreed to pay all of the costs, granting them the right to effectively resolve disputes moving forward in a very efficient manner, and class members who agree to this new ADR program will receive an additional $3,000-$5,000 above their calculated settlement share.[4] Finally, while all class members retained the option to opt-out of the settlement entirely and pursue wage claims individually against Defendants in any other forum of their choosing, only one class member has done so, and no others have exercised that right (including those that initially opted-in to the Neff case).[5]

---

[2] Distributors enter into Distributor Agreements with CK Sales. However, because Plaintiffs contend they are employed by both Defendants, the use of the term "Defendants" will be used throughout this Motion.

[3] As discussed in previous filings, and as explained in more detail below, all class members have signed a "Distributor Agreement" with Defendants under which the class members have purchased distribution rights to one or more "territories" in which they sell and deliver baked good products.  Under the current Distributor Agreement, Defendants are under no obligation to re-purchase the territory from any class member who may wish to sell their distributorships back and end his or her relationship with Defendants, nor are Defendants required to finance a class members' sale of the territory to a third party under the current agreement.

[4] Such a provision has been praised in similar class action settlements as "a clear example of an innovative settlement term that provides Plaintiffs with a right they did not have prior to the settlement." Tavares v. S-L Distribution Co., 2016 WL 1743268, at *13 (M.D. Pa. May 2, 2016).

[5] A region-wide Fair Labor Standards Act collective action that was conditionally certified in the District of Vermont on November 7, 2016, Neff v. Lepage Bakeries, et al., D. Vt. No. 5:15-cv-00254-gwc. All class members were informed of this case, and the Notice clearly informed class members that the release for participating class members in this case would bar their participation in Neff, and therefore that each class members was permitted to make their own decision about whether they wished to exclude themselves from this action to preserve their rights to litigate claims in Neff or elsewhere, or to participate in the settlement and receive settlement funds presently available.

As set forth below, Plaintiffs' counsel believes that the settlement is extremely favorable, and bestows significant monetary and non-monetary benefits upon the class.  The response from class members who are both current and former distributors has been uniformly positive. After the mailing of Notice, 35 out of 36 possible class members have submitted their response forms to participate in the proposed settlement, and none of these participating class members checked the box on their response forms indicating that they had an objection (which they easily could have done). This constitutes a 97% participation rate. Plaintiffs' counsel has subsequently received an objection purportedly on behalf of two class members from another attorney, Charles Schaffer, objecting to the fact that participating class members in this action will be asked to release and settle FLSA claims in conjunction with their participation in the proposed Rule 23 settlement. As set forth in greater detail below, there is no merit to this Objection because the FLSA claims that are released by participating class members are insubstantial and have been properly accounted for in the proposed settlement; further, the proposed settlement compares more than favorably to a settlement cited by Attorney Schaffer that was recently proposed in the Western District of North Carolina against these same Defendants, under which class members would release state wage claims and FLSA claims for an average settlement share of approximately $20,000 (compared to $22,750 in the instant case).[6] In addition, there is no merit to Attorney Schaffer's objection to the ADR provision for current contractors, which a Judge in a similar lawsuit found to be "a clear example of an innovative settlement term that provides

---

[6] The <u>Rehberg</u> case in North Carolina asserts essentially the same state law claims covered by this class action.  The plaintiffs in that action claimed that they were employees under the North Carolina wage laws, seeking deductions from their wages because N.C. Gen. Stat. Ann. § 95-25.8 prohibits withholding of wages absent written authorization.  The wage laws permit a worker to recover unpaid wages, along with liquidated "double" damages. N.C. Gen. Stat. Ann. § 95-25.22.  The Preliminary Approval Motion and Memorandum of Law regarding the <u>Rehberg</u> settlement are attached hereto as Exhibit 6.

Plaintiffs with a right they did not have prior to the settlement," <u>Tavares v. S-L Distribution Co.</u>, 2016 WL 1743268, at *13 (M.D. Pa. May 2, 2016), and the objection reflects a misunderstanding of what concerns are most important to the actual class members.

In sum, the fundamental purpose of fairness review under Rule 23(e), which prohibits class actions from being dismissed or compromised without court approval, is to protect the rights and interests of absent class members.  <u>Jenson v. Cont'l Fin. Corp.</u>, 591 F.2d 477, 482 n.7 (8th Cir. 1979).  In this action, 36 class members received a Notice clearly stating their specific recovery under the proposed settlement and explaining the rights that they would be giving up by participating in the settlement (including their rights associated with the <u>Neff</u> case), and 35 of these individuals (97%) submitted responses indicating that they would like to participate.  The class members are no longer "absent" to the extent that they have almost unanimously spoken and indicated that they want to participate in this settlement and they want it to be approved.

## I.     BACKGROUND.

Plaintiffs initiated this putative wage and hour class action against Defendants under Fed. R. Civ. P. 23 on January 5, 2015.  Plaintiffs and putative class members were "Distributors" who drove delivery trucks weighing over 10,001 pounds,[7] and distributed various breads and baked goods to various retailers in Connecticut.  In order to become Distributors, Plaintiffs and other class members signed a Distributor Agreement, under which they purchased the right to sell and distribute various products within a defined geographic area.[8]  For example, the named Plaintiffs purchased their territories for between $28,000 and $39,000.  Nearly all Distributors financed the

---

[7] As discussed in greater detail below, drivers who operate vehicles weighing more than 10,001 pounds are generally exempt from the overtime protections of the FLSA.

[8] Plaintiffs have the ability to sell or transfer their territory to a third-party to earn a potential profit on the transaction.

territory purchase through FloFin, another subsidiary of Flowers Foods, and the amount owed on this loan is paid to FloFin out of amounts Plaintiffs earn in their distributorships, referred to as Plaintiffs' "settlement," on a weekly basis. Defendants also deduct additional amounts each week for various other charges and expenses associated with servicing these territories. Plaintiffs sign an authorization for these deductions, although they challenge the sufficiency of that authorization here. Although they were treated as "independent contractors" of Defendants, Plaintiffs alleged that all Distributors were actually Defendants' "employees" under Connecticut's wage laws, and that they were entitled to recover amounts deducted from their wages.[9] At all times, Defendants have denied Plaintiffs' allegations, denied that they violated the law in any way, and denied that Plaintiffs are entitled to any of the damages they claim here.

After this action was commenced, the Parties first attempted an early mediation of the dispute with experienced wage and hour mediator Carole Katz, Esq. of Pittsburgh, Pennsylvania in June 2015.  At that first mediation session, the Parties were unable to resolve this matter and subsequently engaged in substantial discovery and motion practice.  Defendants' moved for partial judgment on the pleadings (see ECF No. 58), which Plaintiffs opposed and, in opposition, sought to amend their Complaint to clarify several of their statutory and common law claims.  In

---

[9] Under Connecticut law, any service provided by an individual is considered employment, unless and until the putative employer demonstrates that:

    I.    Such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and

    II.    Such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and

    III.    Such individual is customarily engaged in an independently established trade occupation, profession or business of the same nature as that involved in the service performed....

Tianti, ex rel. Gluck v. William Raveis Real Estate, Inc., 231 Conn. 690, 698 n. 8, 651 A.2d 1286, 1290 n. 8 (1995).

a full written decision, the Court later granted Plaintiffs' leave to amend, and denied and terminated Defendants' Motion for Partial Judgment on the Pleadings.  See ECF No. 106.  In discovery, the parties exchanged tens-of-thousands of pages of documents related to the class-wide allegations, conducted six depositions, and undertook intensive investigation of the Plaintiffs' claims.

By agreement of the Parties and with the Court's consent, the Parties thereafter filed motions for summary judgment prior to addressing the issue of class certification.  In their Motion, Defendants argued that they were entitled to judgment as a matter of law on the entirety of Plaintiffs' complaint on the grounds that Plaintiffs' state law claims were preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1).  See ECF No. 83. Plaintiffs opposed this Motion, and moved for summary judgment as to liability on the issue of the three named Plaintiffs' employment status under the Connecticut Wage laws, which Defendants fully opposed. See ECF No. 79. Plaintiffs also moved to strike the report of Defendants' proposed expert, which was opposed.  See ECF No. 77.

While the motion to strike and the summary judgment motions remained pending, the Parties went back to mediation a second time with mediator Carole Katz on November 7, 2016. Prior to this second mediation, Defendants shared detailed, class-wide data regarding business expenses deducted from Distributors' settlement, from which both Parties were able to analyze the potential damages at issue in the case and assess the various risks associated with continuing with the litigation.  As a result of arms-length negotiations, after this second day of mediation, the Parties reached a proposed Settlement Agreement that is the subject of this Motion.

Plaintiffs moved for preliminary approval of the class action settlement and certification of a settlement class on December 2, 2016.  See ECF No. 116.  The Court conducted a telephone

hearing on the preliminary approval motion on December 15, 2016, after which Plaintiffs submitted revised Notice forms based on the Court's suggested revisions.  Notice was mailed to all 36 members of the settlement class on December 20, 2016.  Since that time, Plaintiffs' counsel has worked diligently to locate updated address information and re-mail the Notice to any class member whose mailing was returned as "undeliverable," and to e-mail the individualized Notice packets to each class member based on e-mail addresses provided by Defendants.  As of the filing of this Motion, 35 class members have responded and elected to participate in this settlement and receive their share of the settlement funds, representing 97% participation.  One individual has opted out of the settlement class only because prior to the settlement he had retained his own counsel to pursue claims under the Massachusetts wage laws because he performed most of his deliveries in Massachusetts. The settlement funds originally designated for the lone opt-out will not revert to Defendants, and will be redistributed to the 35 participating class members on a pro rata basis.  Finally, the two class members now purporting to object to the settlement spoke with Plaintiffs' counsel some time ago, submitted claim forms to participate in the settlement following those conversations, and specifically could have, but did not, check the box "objecting" to the settlement.

## II.     THE TERMS OF THE PROPOSED SETTLEMENT.

### A.   Monetary Terms.

The total settlement amount is $1,250,000, to be distributed to the 35 participating class members out of the 36-person class, an extremely high claims rate. Based on the formula set forth in the settlement agreement, the proposed class shares to the 35 participating class members are contained in Exhibit 4.[10] The settlement shares range from $2,300 for an individual who

---

[10] These settlement shares do not include the additional amounts of $3,000 and $5,000 that many settlement class members will receive for executing the new Distributor Agreement.

worked for Defendants for only 9 weeks, to over $38,000 for an individual who worked for the entire class period of 3 ½ years. In addition to the settlement shares described above, the settlement agreement also proposes to pay incentive payments of $20,000 each to the three named Plaintiffs who initiated this action to benefit the entire class of Distributors in Connecticut, and who actively participated in this action, responded to written discovery, testified in day-long depositions, and attended mediation.  The total incentive payments would amount to $60,000.  As discussed below, these incentive payments are within the range routinely approved by courts in cases of this nature.

Of the remaining settlement funds, an additional $53,000 will be distributed to the 11 current Distributors who wish to continue their Distributor relationship with Defendants, and who will therefore execute a New Distributor Agreement (described in more detail below below).

Finally, the settlement agreement proposes to pay an award of 30% of the gross settlement amount ($375,000), to class counsel as attorney's fees, as well as an award of $18,687 for litigation expenses.  The total amount requested for fees and costs is $393,687, approximately 31.5% of the settlement fund. Plaintiffs' counsel will also administer the settlement in-house using its experienced in-house Class Action Administrator, thereby saving the substantial costs of a third-party class action administrator.

B.  The "Buy-Back" Option for Current Distributors.

As an additional term of the Settlement Agreement, any participating class members who currently have a Distributor Agreement with Defendants may sell their territories back to Defendants at an amount that is ten times their average weekly branded sales, *plus* an additional ten percent premium, *minus* any balance owed to Defendants (such as the outstanding balance on

their territory loan).[11]   In addition, Defendants will waive the five percent transfer fee. The three named Plaintiffs have already taken advantage of this option.   Seven other current distributors have already requested to exercise this "buy-back" option.   Plaintiffs' counsel has spoken in detail with many of the settlement class members about the "buy-back" option, and the response has been strongly positive.  (See Thomson Aff. at ¶ 9, attached hereto as Exhibit 3.)

This feature of the Settlement Agreement gives a significant benefit to the class members who continue to own distributorships with Defendants.  At present, there may be any number of these class members who would like to terminate their relationship with Defendants and cease owning a distributorship; however, under the current Distributor Agreement, Defendants are not obligated to repurchase the territory or to finance a third party's purchase of the territory from the class members. Further, even if Defendants chose to repurchase the distributorships, because the class members have all owned their distributorships for less than five years, the price at which the Company would repurchase the territory would not include appreciated equity, pursuant to the Company's buy-back guidelines.  More specifically, under the present Distributor Agreement, only after five years of owning the territory (October 2018 or later for all class members) would Defendants *consider* repurchasing a class member's territory at a price that would include appreciated equity, under the formula of ten times the average weekly branded sales.  And any repurchase of distributorship would be subject to a 5% transfer fee.  However, under the Settlement Agreement, current Distributors who participate in the settlement can sell back their territories now for ten times the average weekly branded sales <u>plus</u> the 10% premium, and the transfer fee is waived.  Any participating class member is free to exercise this option (provided they give the Company reasonable notice, as outlined in the Settlement Agreement),

---

[11] Any Distributor who wishes to exercise this option must inform the Company of their intent to do so at any time up to 30 days following the Court's Order granting final approval of the settlement.

and to end their relationship with Defendants while potentially receiving a substantial sum of money, separate from their settlement share, that they otherwise would not be entitled to. This also presents opportunities for remaining distributors to purchase multiple distributorships.

C.   The New Distributor Agreement and Updated Alternative Dispute Resolution Processes.

Along with the substantial cash recovery and the "buy-back" option for class members who are current Distributors, the settlement agreement grants several benefits to those current Distributors who wish to participate in the settlement but also wish to continue owning a distributorship.  First, Defendants agree to create an optional ombudsman position or advocate at the corporate level and a distributor review panel as additional dispute resolution ("ADR") options.  Defendants also agree to conduct periodic distributor partnership meetings and additional training of sales management.

Second, current Distributors will execute a new Distributor Agreement with several beneficial provisions. For example, the new Distributor Agreement reduces the transfer fee from 5% to 2% for territory sales between distributors directly. It also contains a provision allowing distributors and the Company to work in good faith to explore opportunities to remedy account(s) distributors believe are unprofitable. In addition to the ADR options discussed above, the New Distributor Agreement contains a cost-effective arbitration provision, which will allow for faster and more efficient resolution of disputes, and which will be administered by the AAA. Defendants agree to pay for any filing fees and costs typically associated with AAA arbitration, though the ability to assert a class action claim in state or federal court is waived.  Plaintiffs' counsel believes these programs provide settlement class members with important benefits that do not currently exist, particularly the expedited means of resolving future disputes, including arbitration if necessary for which Defendants will pay all filing fees and costs.

Based on Plaintiffs' counsel's investigation of this case, and in representing the named Plaintiffs, it has become evident that the most important disputes that are a concern to Distributors are more akin to contract disputes that would be well-suited for arbitration (as opposed to long, drawn-out litigation), and the new Distributor Agreement makes resolution of these issues more convenient and more cost-effective.[12]   For example, class members may dispute the justification for several hundred dollars in "shrink" charges on a settlement statement for product that has allegedly gone missing from a store's shelf.   Under the current Distributor Agreement, if the class members were unable to resolve those issues with sales management directly, class members would have to litigate such disputes in a federal or state court, and this can make it difficult to resolve many of the "low-value," day-to-day disputes that concern class members the most. Under the terms of the Settlement, now Distributors can take these issues to the ombudsman or the distributor review panel. Arbitration is then provided as a way to resolve all remaining disputes or disputes that cannot be resolved with the ombudsman or distributor panel. The new Distributor Agreement will also allow for the application of the actual statute of limitations for any of Plaintiffs' claims, as opposed to a shortened one-year statute of limitations in the current Distributor Agreement, and also takes out several other provisions that would otherwise limit their damages, such as a limitation of remedies provision. Not surprisingly, Defendants are not willing to agree to arbitration in the absence of a class and collective action waiver; however, such waivers have become commonplace in arbitration provisions.   Though Distributors who sign the new Distributor Agreement receive additional benefits from arbitration, Plaintiffs' counsel recognizes that they are also giving up some future rights to pursue class or collective adjudication of their claims, and therefore each individual who executes the new Agreement will receive an additional $3,000 or $5,000 from the settlement

---

[12] The other ADR options promote this as well.

fund in consideration for their execution of it.  See generally <u>Tavares v. S-L Distribution Co.</u>, 2016 WL 1743268, at *13 (M.D. Pa. May 2, 2016) (describing similar settlement term as "innovative" and noting that it provided class members with a right they did not have prior to the settlement).

    D.  <u>The Release.</u>

All class members who do not exclude themselves from the settlement will be subject to a release of all claims asserted in this action, that could have been asserted in this action, or that are reasonably related to the this action.  This includes, but is not limited to, all claims arising under the Connecticut wage laws, and common law claims related to any alleged non-payment of wages. Those class members who participate in the settlement have signed a Response Form by which they will release any claims arising under the Fair Labor Standards Act.  In addition, the three named Plaintiffs will execute a general release of claims against Defendants.

Because participating Plaintiffs will be waiving claims under the FLSA, if the participating class member wants to participate in the settlement of this lawsuit (and they have the option to opt-out if they do not want to do so), they cannot also participate in the FLSA collective action that recently received conditional certification in Vermont, <u>Neff v. Lepage Bakeries, et al.</u>, D. Vt. No. 15-00254, or in any other similar lawsuit against Lepage, CK Sales or any of their affiliated companies involving any of the released claims.  Class members were notified of this and knew this when they elected to participate.  The claims asserted in <u>Neff</u> are brought exclusively for overtime under the FLSA.  However, based on Plaintiffs' counsel's analysis, even if the class members were successful in demonstrating that they were employees of Defendants under the FLSA's "economic realities" test, which Defendants deny, they would likely be exempt from the FLSA's overtime protections under the Motor Carrier Act exemption,

29 U.S.C. § 213(b)(1) or outside sales exemption, 29 U.S.C. § 213(a)(1), or both (see discussion below at pp. 24-30.).[13]

"The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 107 (2d Cir. 2005), citing TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 460 (2d Cir.1982).   As the Second Circuit has recognized, "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country…." Id. at 106. For this reason, settlements in wage and hour cases routinely release wage claims that were not asserted (e.g., minimum wage, overtime, non-payment of wages).  See generally Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 181 (W.D.N.Y. 2011) (approving release that covered "*all* wage and hour claims" in class action lawsuit for unpaid overtime wages).  The release in this case is consistent with this practice.

### III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND FINAL APPROVAL IS WARRANTED.

Before a Rule 23 settlement may be approved, a "district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000).  As this Court has previously observed, "[t]his analysis is usually divided into two steps. First, a court will analyze the procedural aspects of the settlement to determine whether the nature of the settlement proceedings give rise to concerns of procedural unfairness."  Wilson v. DirectBuy, Inc., 2011 WL 2050537, at *3 (D. Conn. May 16,

---

[13] As set forth above, the Connecticut employment claims are governed by a more favorable "ABC" employment test under which Plaintiffs are presumed to be employees unless Defendants can demonstrate that Plaintiffs were free from their control, that they performed their work outside Defendant's normal course or place of business, and that they were independently established businesses.

2011), citing <u>McReynolds v. Richards-Cantave</u>, 588 F.3d 790, 803-04 (2d Cir. 2009).   A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." <u>Wal-Mart Stores, Inc.</u>, 396 F.3d at 116.  Second, a court will consider the substantive fairness of a settlement agreement, utilizing the nine factors articulated by the Second Circuit in <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 454 (2d Cir.1974). These factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>McReynolds</u>, 588 F.3d at 804 (2d Cir.2009) (quoting <u>Grinnell</u>, 495 F.2d at 463).

As set forth below, the proposed settlement is entitled to the presumption of fairness, nearly all of the relevant <u>Grinnell</u> factors favor approval of the settlement, and there is no merit to <u>Neff</u> counsel's objection to the settlement.

### A.  The Settlement Demonstrates Procedural Fairness and Is Entitled to the Presumption of Fairness.

Class action settlements are entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arms's length negotiations between experienced, capable counsel after meaningful discovery." <u>Wal–Mart</u>, 396 F.3d at 116.  Procedural fairness is apparent here. Both parties are represented by highly experienced counsel. Plaintiffs' counsel at Lichten & Liss-Riordan is highly experienced in similar wage and hour class action litigation on behalf of delivery drivers and other allegedly misclassified workers, and have successfully litigated and obtained settlement approval in many similar cases across the country.   <u>See</u>, <u>e.g.</u>, <u>Scovil v.</u>

FedEx Ground Package Sys., Inc., 2014 WL 1057079, at *4 (D. Me. Mar. 14, 2014) ("Lead counsel, Harold Lichten, has represented numerous individuals alleging misclassification and failure to pay wages and other benefits in individual and class actions across the country [and] the law firm of Lichten & Liss–Riordan represented classes of [FedEx] drivers in Connecticut, Massachusetts and Vermont….").[14] Attorney Richard Hayber and attorneys at the Hayber Law Firm also have significant experience representing workers in wage and hour class and collective actions under Connecticut's wage laws and the FLSA.  See, e.g., Bozak v. FedEx Ground Package Sys., Inc., 2014 WL 3778211, at *7 (D. Conn. July 31, 2014); Zaniewski v. PRRC Inc., 848 F. Supp. 2d 213, 230 (D. Conn. 2012).  As this Court has previously observed, the "Hayber Law Firm, LLC, are experienced employment lawyers with good reputations among the employment law bar. They have prosecuted and favorably settled many employment law class actions, including wage and hour class actions."   Aros v. United Rentals, Inc., 2012 WL 3060470, at *6 (D. Conn. July 26, 2012). Defendants' counsel likewise has substantial experience in litigating these kinds of cases and negotiating settlements in complex cases like this.  The settlement is the product of arms-length bargaining conducted after extensive analysis of the relevant discovery record and compensation data, and after two full days of forma mediation in June 2015 and November 2016 with Carole Katz, Esq., a mediator highly-experienced in the area of independent contractor misclassification and cases of this type.

---

[14] Plaintiffs' counsel have set forth their experience in this field in greater detail in the attached Affidavits. (See Lichten Aff., attached hereto as Exhibit 2; Hayber Aff., attached hereto as Exhibit 7.) Additional cases litigated by Plaintiffs' counsel at Lichten & Liss-Riordan include:  Costello v. BeavEx, Inc., 810 F.3d 1045 (7th Cir. 2016) (representing class of misclassified delivery drivers); Scantland v.. Jeffry Knight, Inc., 721 F.3d 1308 (11th Cir.2013) (representing class of misclassified cable installers seeking unpaid wages); Anderson v. Homedeliveryamerica.com, Inc., 2013 WL 6860745 (D. Mass. Dec. 30, 2013) (class of delivery drivers were employees under Massachusetts law); Martins v. 3PD, Inc., No. 11–11313–DPW, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) (same); Somers v. Converged Access, Inc., 911 N.E.2d 739 (Mass.2009) (landmark decision of the Massachusetts Supreme Judicial Court on independent contractor misclassification).

**B.  The Settlement is Substantively Fair.**

Courts in the Second Circuit examine substantive fairness, adequacy, and reasonableness by analyzing the proposed settlement through the <u>Grinnell</u> factors.

### 1. Complexity, Expense, and Likely Duration of Litigation.

"Courts have recognized that wage and hour cases involve complex legal issues." <u>Johnson v. Brennan</u>, 2011 WL 4357376, at *17 (S.D.N.Y. Sept. 16, 2011).   In addition to Plaintiffs' claims for misclassification and unpaid wages under Connecticut's wage laws, several complex issues also arose related to Defendants' affirmative defenses that may have eventually extended the litigation and led to an appeal. In their Motion for Summary Judgment, Defendants argued that they were entitled to judgment as a matter of law on the entirety of Plaintiffs' complaint on the grounds that Plaintiffs' state law claims were preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1) because the Connecticut "test" for employment status improperly affects Defendants' "prices, routes, and services" related to the transportation of property. See ECF No. 83. The law related to FAAAA preemption of delivery drivers' state law employment claims continues to develop, and there is currently no binding Second Circuit caselaw that is directly on point.   The First Circuit has held that "Prong B" of the Massachusetts three-part employment test (which is similar to the test in Connecticut) is preempted by the FAAAA as applied to FedEx delivery drivers. <u>See</u> <u>Schwann v. FedEx Ground Package Sys., Inc.</u>, 813 F.3d 429 (1st Cir. 2016).  Courts in New Jersey have applied Third Circuit precedent to hold that misclassification claims of delivery drivers under the New Jersey state wage laws (which also use a similar three-part test to Connecticut) are not preempted by the FAAAA. <u>See, e.g.</u>, <u>Echavarria v. Williams Sonoma, et al.</u>, 2016 WL 1047225, (D.N.J. Mar. 16, 2016). There is a certiorari petition pending at the United

States Supreme Court in the Costello v. BeavEx, Inc., 810 F.3d 1045 (7th Cir. 2016), an "FAAAA" decision relied upon by Plaintiffs in their brief, and there is a pending Ninth Circuit appeal in Ortega v. J.B. Hunt Transport, Inc., Ninth Cir. App. No. 14-56034, a case relied upon by Defendants in support of heir FAAAA preemption argument.  The Parties had fully briefed the issue of FAAAA preemption in this case, and depending on the Court's decision on this issue, either party may have sought appeal to the Second Circuit.

Had Plaintiffs survived Defendants' motion for summary judgment under the FAAAA, Defendants argued that Plaintiffs were not entitled to summary judgment on any prongs of the "ABC" test.  Defendants had argued that because Plaintiffs purportedly had a "saleable business," Plaintiffs were engaged in independently established trade or business under "Prong 3" of the ABC test.  Defendants also argued that they would demonstrate that Plaintiffs performed work outside their usual place of business under Prong 2.  See Standard Oil of Connecticut, Inc. v. Adm'r, Unemployment Comp. Act, 320 Conn. 611, 614, 134 A.3d 581, 585 (2016). Though Plaintiffs contested the applicability of a "saleable business" analysis under Prong 3, see Daw's Critical Care Registry, Inc. v. Dep't of Labor, Employment Sec. Div., 42 Conn. Supp. 376, 410, 622 A.2d 622, 640 (Super. Ct. 1992), aff'd, 225 Conn. 99, 622 A.2d 518 (1993), and contended that Defendants could not satisfy Prong 2, these issues had been briefed at length by the Parties, along with the applicability of Prong 1's control test.

Defendants also asserted as an affirmative defense that even if Plaintiffs and other drivers were found to be employees under the Connecticut wage laws, any alleged "deductions" from their wages were not recoverable because Defendants obtained written authorization for many the deductions. Plaintiffs intended to argue that any written authorization was insufficient, but there is little guiding precedent from the Connecticut state courts that would have foretold

whether the various authorizations for the various adjustments (territory payments, truck leases, truck/business insurance, warehouse fees, administrative fees, shrink charges, etc.) were sufficient under Conn. Gen. Stat. § 31-71e.  This issue would have been hotly contested by both Parties.

In sum, this case has been vigorously litigated for over two years.  At the time of settlement, the Parties were awaiting the Court's ruling on their motions for summary judgment, and the Parties had yet to brief the class certification issues prior to trial.  Given the complex issues described above, there was a high likelihood of an appeal and it is conceivable that if litigation were to continue, class members would not see any meaningful recovery (if any) for a number of years.  This factor strongly supports approval of the settlement.

### 2. Reaction of the Class to the Settlement.

After the mailing of Notice, 35 out of 36 possible class members have enthusiastically submitted their response forms to participate in the proposed settlement, and none of these participating class members checked the box on their response forms indicating that they had an objection (which they easily could have done).  This constitutes a 97% participation rate.  An objection was received by counsel in the Neff matter on behalf of two participating class members on the grounds that class members should not be asked to release FLSA claims in conjunction with their participation in this settlement.  As discussed below, there are no facts within the objection indicating that these two class members had viable FLSA overtime claims (e.g., it is not clear whether they operated vehicles weighing 10,000 pounds or less in interstate commerce), and Plaintiffs' counsel's investigation indicated that operation of vehicles less than 10,000 pounds in interstate commerce was extremely rare and that class members were likely exempt from the FLSA's overtime requirements.  (Lichten Aff., Ex. 2, at ¶¶ 6-7; Thomson Aff.,

Ex. 3, at ¶¶ 3-4.) Further, in the <u>Rehberg</u> settlement against these same Defendants in the Western District of North Carolina, $5.2 million is proposed to cover the release of state law deduction claims as well as FLSA claims for 259 drivers in a case covering almost an eight-year statutory period (approximately $20,000 per class member for release of state law and FLSA claims). Here, with a statutory period that was half as long, the settlement provides an average of $22,750 to each driver for release of state law and FLSA wage claims. <u>Neff</u> counsel's suggestion that the FLSA claims were not taken into account in this proposed settlement is incorrect. Plaintiffs shall address the Objection in more detail in "Section II.C." below.

### 3. Stage of Proceedings and Amount of Discovery.

Discovery in this matter is complete, the Parties have exchanged thousands of documents, the Parties have conducted six depositions, Defendants' have shared detailed compensation data related to the total deductions from the class members' pay, the Parties have attended two full day mediation sessions with an experienced mediator, both sides have fully briefed the merits of Plaintiffs' misclassification claims and Defendants' preemption defense at summary judgment, and Plaintiffs' counsel has spoken directly with over half of the class members to investigate the claims at issue. (Thomson Aff., Ex. 3, at ¶ 3.) The parties have a very clear view of the strengths and weaknesses of the case, and this factor supports a finding of fairness.

### 4. Risks of Establishing Liability.

The two central issues affecting liability were fully briefed and presented in the Parties' Motions for Summary Judgment. Defendants argued that they were entitled to judgment as a matter of law on the entirety of Plaintiffs' complaint on the grounds that Plaintiffs' state law claims were preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1). See ECF No. 83. Plaintiffs opposed this Motion, and

moved for summary judgment on the issue of the three named Plaintiffs' employment status under the Connecticut Wage laws, which Defendants fully opposed.  See ECF No. 79.  In order to establish liability, Plaintiffs would have had to either succeed on the misclassification issue at summary judgment or at trial, and Plaintiffs would have had to defeat Defendants' motion for summary judgment, which sought to bar Plaintiffs from any recovery under the doctrine of FAAAA preemption.  Though Plaintiffs remain confident in their likelihood of success, the Parties' substantial briefing on these two liability issues demonstrates the risks inherent in continuing with the litigation and the challenges in establishing Plaintiffs' status as employees under the Connecticut wage laws.

### 5. Risk of Establishing Damages.

Were Plaintiffs successful in establishing that they were Defendants' employees for purposes of the Connecticut wage laws, it would have been reasonably straightforward to ascertain the amounts deducted from the class members' pay; however, it would have presented challenges to establish that all types of deductions from class members' pay were recoverable.

Plaintiffs' counsel calculated the total "deductions" from the class' pay to be $2.3 million, less than twice the amount of the gross settlement amount of $1.25 million.  The potential "deductions" damages were comprised of the following:

| | |
|---|---|
| Stale Adjustment | $93,997.48 |
| Territory Payment | $729,185.30 |
| Truck Purchase | $5,630.04 |
| Truck Lease | $701,749.86 |
| Truck Rental | $2,829.01 |
| Truck Repair | $6,995.40 |
| Truck Tax, Tag, License, Fees | $18,802.88 |
| Truck/ Business Insurance | $226,141.60 |
| Warehouse Fee | $176,925.00 |
| Administrative Fee | $150,750.00 |
| Open Route Expense | $410.72 |

| Beepers | $191.00 |
|---|---|
| AIP/ Apparel | $423.42 |
| Temp Services Fee | $46,307.02 |
| SBT Shrink Charge | $156,508.22 |
| **TOTAL** | **$2,316,846.95** |

Though Plaintiffs sought to recover all of these amounts on behalf of the class, there is no Connecticut caselaw holding that these various types of deductions are recoverable.  For example, Plaintiffs have argued that they are entitled to recover over $700,000 in "territory payments" deducted from their compensation; however, Defendants likely would have argued that in exchange for the territory payments, class members received a transferrable ownership interest in the "territory," and some class members later sold their territories to recoup these amounts and earn a "profit" on the transfer of the territory, thus benefitting from the transaction. Other deductions were authorized in writing, and Defendants likely would have argued that they were not recoverable under Conn. Gen. Stat. § 31-71e.  Further, several class members simultaneously operated between two and four territories for Defendants, and paid "secondary drivers" to drive trucks to service the additional territories. There is no Connecticut caselaw holding that the class members, if they are found to be employees, are entitled to recover deductions arising from the work of these secondary drivers. In interpreting the Massachusetts wage laws in a similar delivery driver case, a Judge in the District of Massachusetts held that drivers who were found to be employees could only recover the "portion of the deductions made against any of their accounts [that] is actually attributable to work they, and not one of their secondary drivers, performed."  Martins v. 3PD Inc., 2014 WL 1271761, at *10 (D. Mass. Mar. 27, 2014).  Plaintiffs would argue that this is a misapplication of Massachusetts law, and that the same theory is not applicable in Connecticut; however, given the dearth of Connecticut caselaw

regarding prohibited wage deductions, this would have presented additional challenges in establishing that the entire $2.3 million was recoverable under Connecticut's wage statutes.

### 6. Risks of Maintaining the Class.

Plaintiffs believe that they would have satisfied the requirements of Rule 23(b) and proceeded on a classwide basis on behalf of the 36 class members. However, Defendants would have argued that class treatment is not proper and that the proposed class did not satisfy the prerequisites for class certification. These same Defendants have defeated a motion for class certification of similar misclassification and wage deductions claims in the Central District of California under Federal Rule 23, demonstrating that there is no guarantee that this case would have proceeded on behalf of the entire class. See Martinez v. Flower Foods, et al., No. 15-5112, slip op. (C.D. Cal. Feb. 1, 2016) (attached hereto as Exhibit 5).

### 7. Ability of Defendants to Withstand Greater Judgment.

There is no indication that Defendants would have been unable to withstand a judgment greater than the total settlement amount.  Although Defendant may be able to withstand a greater judgment, this factor alone does not render the settlement unfair, particularly when considered with the other Grinnell factors weighing in favor of settlement. See In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164, 178 n. 9 (S.D.N.Y. 2000), aff'd, 236 F.3d 78 (2d Cir. 2001) ("a defendant['s] ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair").

### 8. Range of Reasonableness of Settlement Fund in Light of the Best Possible Recovery and Attendant Risks of Litigation.

The court must also consider the range of reasonableness for a settlement in this case, in light of the best possible recovery and the attendant risks of litigation discussed above.  As stated above, assuming they were successful in establishing liability, Plaintiffs' counsel calculated that

their best recovery of all possible "deductions" on behalf of the class was approximately $2.3 million.   The number also would have been subject to doubling if Defendants failed to established that they had a good faith belief that they were acting in compliance with the law. Conn. Gen. Stat. § 31-72. After accounting for attorney's fees, incentive payments, and payments for the ADR agreement to participating class members, the total recovery for the class is $796,313, or 34.6% of $2.3 million (and the gross settlement amount of $1.25 million is 54% of the potential recovery of $2.3 million).  However, as discussed above, there is no Connecticut caselaw defining which "categories" of deductions would have been recoverable, particularly those deductions that arose from work performed by others. Had Plaintiffs been successful in defeating Defendants' FAAAA argument and establishing their employee status, there is no guarantee that all "wage deductions" would have been included in their damages.

As a comparison, the Rehberg settlement against these same Defendants cited by the objecting counsel allocates funds for 100% recovery of the administrative fees and warehouse fees deducted from the class members' compensation in that case, with no consideration for additional wage deductions.  By this measure, if the class members in this case had only been successful in recovering these two "categories" of deductions, class members would be receiving 240% of their single damages ($796,313 total recovery paid to class members [divided by] $327,000 in warehouse and administrative fees).  Regardless, by any measure the recovery here is substantial and given the potential risks and delays in continuing with the litigation, the settlement falls within the range of reasonableness that is expected in a case of this nature and should be approved. See In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 745 (S.D.N.Y. 1985), aff'd, 798 F.2d 35 (2d Cir. 1986) (approving settlement where class members would "recover approximately 12% of a reasonable damage figure"); City of Detroit v. Grinnell Corp.,

356 F.Supp. 1380, 1386 (S.D.N.Y.1972) (3.2% to 3.7% of the potential recovery "well within the ball park"), aff'd in part, rev'd on other grounds, 495 F.2d 448 (2d Cir.1974); cf. Wilson v. DirectBuy, Inc., 2011 WL 2050537, at *14 (D. Conn. May 16, 2011) (finding proposed settlement was not within the range of reasonableness when valued at between $15 million and $27 million and possible damages were $2 billion, approximately 1% of potential recovery).

Further, the Settlement provides significant non-monetary relief to the class members. Plaintiffs' counsel has not attempted to assigned a dollar value to this relief, but it is significant that the settlement provides current contractors with a cost-free arbitration opportunity to address their day-to-day disagreements that arise under their contracts with Defendants, many of which may be "low value" disputes that would be prohibitively expensive to litigate in court.  The Settlement also permits current Distributors who participate in the settlement to sell back their territories to Defendants for ten times the average weekly branded sales plus the 10% premium, with full waiver of the normal transfer fee.  Any participating class member is free to exercise this option (provided they give the Company reasonable notice), and to end their relationship with Defendants while potentially receiving a substantial sum of money, separate from their settlement share, that they otherwise would not be entitled to under the Distributor Agreement. All told, the "going-forward" relief described herein adds significant value to the settlement.

### C.  There is no merit to the objection from Neff counsel.

As discussed above, one attorney[15] for the conditionally certified collective in the Neff case has objected to this settlement only because it includes a release of Fair Labor Standards

---

[15] Though Attorney Schaffer's credentials demonstrate that he is experienced in the fields of "Medical Malpractice, Products Liability, Environmental Liability, Personal Injury and Admiralty Law," his online biography does not state that he has any specialized experience in employment law, nor any expertise in representing delivery drivers or other workers in misclassification lawsuits seeking unpaid wages.  See http://lfsblaw.com/attorneys/charles-e-schaffer/.

Act claims for class members who choose to participate in this settlement and has an arbitration provision for future disputes with a class action waiver.  There is no merit to this objection.

Plaintiffs filed this case on January 6, 2015.  The Parties attended a mediation with Carole Katz in June 2015 where they discussed possible terms of a Rule 23 settlement, including amendments to the Distributor Agreement and the scope of any possible release; however, the Parties were unable to agree on other aspects of the settlement.  The originating plaintiffs in Neff, none of whom performed any work in Connecticut, filed their proposed FLSA Collective action in Vermont six months later in December 2015.

Litigation in this Bokanoski matter continued after the first mediation session through discovery and summary judgment briefing, and while motions for summary judgment were pending the Parties resumed settlement discussions at a second mediation session with Ms. Katz on November 7, 2016.  At the outset of the November 7 mediation, the Parties reaffirmed their prior discussions regarding the scope of the release and several other aspects of the settlement. Several hours later, as that mediation was ongoing, the Parties learned that the Neff court in the District of Vermont had conditionally certified a collective action that would cover the FLSA claims of the putative class members to this Rule 23 action.  At that time, there were still no individuals covered by this Rule 23 Connecticut matter who were plaintiffs or opt-in plaintiffs in the Neff case.

In December 2016, the Connecticut drivers covered by this settlement received the notice informing them of their rights to join the Neff action *prior to* mailing of Notice of the proposed class action settlement in this case.  Eight of the members of this Rule 23 class submitted forms to opt-in to Neff before they had received the settlement notice in this Bokanoski Rule 23 case. (Thomson Aff., Ex. 3, at ¶¶ 5-6.)   After the Rule 23 settlement notice in this case had been

mailed, Plaintiffs' counsel personally spoke with seven of these individuals.[16]   (Thomson Aff., Ex. 3, at ¶ 7.)   Though counsel will not disclose the complete discussions as they are protected by the attorney-client privilege (unless the Court so orders), all seven of these individuals subsequently understood their options in relation to the two cases (as had been set forth in the Bokanoski settlement notice), and all seven of these Connecticut drivers subsequently submitted claim forms to participate in this settlement without stating any objection (as they were invited to do through the simple "check-box" on the Response form).   (Thomson Aff., Ex. 3, at ¶ 7.)

The FLSA claims asserted in Neff seek unpaid overtime under 29 U.S.C. § 207.   Since the class members were paid a certain amount for delivery and sale of specific products (as opposed to a flat hourly rate), if they were found to be non-exempt employees under the FLSA, they would be owed an extra "half-time," or 50% of their regular hourly rate, for hours worked over forty in a given week, utilizing the fluctuating work week method.   29 C.F.R. § 778.112. But there are two serious impediments to this claim.

First is the exemption to the FLSA's overtime requirement in Section 13(b)(1) of the FLSA, known as the Motor Carrier Act Exemption ("MCA Exemption"). This provision provides that overtime pay is not required for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." See 29 U.S.C. § 213(b)(1).   Congress clarified MCA Exemption in 2008, stating that "Section 7 of the Fair Labor Standards Act [the overtime protections]... shall apply to a covered employee notwithstanding section 13(b)(1) of that Act." See Technical Corrections Act (TCA), Pub.L. No. 110–244, § 306(a). The TCA defines the term "covered employee" as an employee of a motor carrier whose job, "in whole or in part," affects the safe operation of vehicles lighter than 10,000

---

[16] The eighth class member recently filed his opt-in in Neff, after having submitted his claim form in this matter without objection.

pounds. Corrections Act § 306(c); <u>McMaster v. E. Armored Servs., Inc.</u>, 780 F.3d 167, 169 (3d Cir. 2015).  In short, this means that in order to receive overtime pay under the FLSA, a driver must transport property in interstate commerce in a vehicle weighing less than 10,000 pounds as "more than a *de minimus* part" of the his or her duties. <u>Garcia v. W. Waste Servs., Inc.</u>, 969 F. Supp. 2d 1252, 1261 (D. Idaho 2013).  Thus, in order to receive overtime pay under the FLSA, the <u>Neff</u> drivers must have transported bread or other baked goods in a vehicle weighing less than 10,000 pounds "more than a *de minimus*" amount.  <u>Id.</u>

First, it is undisputed that all class members drove vehicles weighing more than 10,001 pounds five days per week to deliver Defendants' products.  The only way they can be eligible for overtime is if they also transported product in smaller vehicles more than a *de minimus* amount.  There are no facts within the objection indicating that the two objecting class members had viable FLSA overtime claims.  Plaintiffs' counsel's investigation indicated that occasions of transporting product in small vehicles were either sporadic or non-existent.  At the outset and throughout this lawsuit, Plaintiffs' counsel has spoken to many class members, and has met with them on several occasions before filing suit.  Based on these initial communications, Plaintiffs' counsel considered but ultimately decided not to bring overtime claims under the FLSA because all the drivers made deliveries in trucks weighing over 10,001 pounds.  Further, while some of the class members might drive their smaller personal vehicle to the stores on their non-delivery days (Wednesday and Sunday when the warehouse was closed), in most if not all of those instances, no product was delivered in the drivers' personal vehicles when they went to the store to straighten up.  This has recently been confirmed in Plaintiffs' counsel's conversations with various class members over the past several months.  Thus, Plaintiffs did not assert claims for unpaid overtime under the FLSA because they believed at the beginning of this action, and

believe now, that such a claim would likely not be meritorious and in any event, would likely not be certified because individualized analysis would be required to determine how often individuals drove smaller vehicles, if at all, and to identify the few rare instances in which drivers transported product on these smaller vehicles.  See Garcia, 969 F. Supp. 2d at 1261 (in order to receive overtime pay under the FLSA, a driver must "transport property in interstate commerce in a vehicle weighing less than 10,000 pounds as "more than a *de minimus* part" of the his or her duties).[17]

The other relevant exemption is the "outside sales" exemption to the FLSA's overtime protections. An outside salesperson is one whose "primary duty" is making sales, and who is regularly engaged in those duties away from the employer's place of business."  29 C.F.R. § 541.500.  There is detailed regulatory guidance at 29 C.F.R. § 541.504 defining the variety of factors that a court must consider in determining whether delivery drivers like Plaintiffs may be considered "outside salespersons" exempt from the FLSA's overtime requirements.  Here, Defendants undoubtedly would have argued that their Distributor Agreements with all class members include among the class members' duties to "use his/her best efforts to develop and maximize the sale of COMPANY'S products...," and that making those sales to Defendants' customers are the drivers' "primary duties."  This possible exemption, as well as the difficulties in determining the class members' "primary duties" based on common evidence, also contributed to Plaintiffs' counsel's determination not assert claims for unpaid overtime under the FLSA.

The objecting attorney also takes issue with the cost-free arbitration provision applicable to current contractors under the terms of the Settlement, but this portion of the objection reflects a fundamental misunderstanding of its importance, and significance. In this case, as in other

---

[17] Thus it is not enough that on their days off (Wednesday and Sunday) they may have driven their car to the store to straighten up the shelves – they must have actually delivered product in that vehicle, which would be difficult since the warehouse was closed.

similar cases Plaintiffs' counsel has litigated such as a case on behalf of Snyder-Lance snack food delivery drivers, see <u>Tavares v. S-L Distribution Co.</u>, 2016 WL 1743268 (M.D. Pa. May 2, 2016), many of the class members here  complained  about day-to-day issues that they believe were unfair, including such issues as retrieving and returning stale products consistent with Defendants' "stale policy," "shrink charges" that occur when product allegedly goes missing from stores without being sold, and arbitrary treatment from managers. Many class members were frustrated that the only way that they could protest these issues was to take it up with management, but if they were unsuccessful, their only alternative would be a prohibitively expensive lawsuit.  (Lichten Aff., Ex. 2, at ¶ 12.)  The settlement allows every class member to grieve and then arbitrate such claims without any filing fee.  While it is true that this would include a class action waiver, class members are very pleased with their ability to now have some "process" in situations where they were being treated unfairly, and given this new leverage (and cost to the company of paying for the arbitrator), there is much more likelihood that the company would settle the matter with the driver. As Judge Jones of the Middle District of Pennsylvania pointed out in the Snyder-Lance case, this settlement term is both fair, advantageous to the clients, and innovative. <u>Id.</u> at *13 (holding that the ADR provision was "a clear example of an innovative settlement term that provides Plaintiffs with a right they did not have prior to the settlement.")  While it may not benefit class-action attorneys to include a "class action waiver" covering future disputes, it certainly benefits the class members under these circumstances.[18]

---

[18] The North Carolina <u>Rehberg</u> settlement proposed by the objecting attorney contains a similar ADR process for current contractors, with each contractor who agrees receiving an additional $1000.  Here, all current Distributors who are bound by the new ADR provision will receive $3,000 or $5,000 in recognition of the fact that although the ADR provision confers a benefit upon Distributors, they are also giving up some future rights to participate in class action litigation and to a jury trial.

In the Objection, Attorney Schaffer draws several comparisons to the litigation in the Western District of North Carolina against these same Defendants, Rehberg v. Flowers Baking Company, W.D.N.C. No. 09- 596.  The instant settlement however is more favorable than the settlement recently proposed in the Rehberg action by Attorney Schaffer and his co-counsel in that case.  In that action, the plaintiff drivers alleged that they were misclassified as independent contractors, and brought state law claims to recover deductions from their purported wages, as well as unpaid overtime.[19]  A Rule 23 class had been certified, the plaintiffs had survived Defendants' motion for summary judgment, and the parties were preparing to proceed to trial.

The parties in that action recently filed for preliminary approval of a settlement on behalf of 259 drivers, covering the time period of September 2009 to the present (nearly 7 ½ years).  The proposed settlement is for $9 million dollars.  After accounting for the requested attorneys' fees and costs of 42% ($3.8 million), the average class share in that settlement is $20,077 per class member (before accounting for incentive payments) covering seven-and-a-half years and assuming full participation ($5.2 million / 259 class members).  Here, after accounting for the requested attorney's fees and costs award of $393,687, the average class share is $23,786 at full participation ($856,313 / 36 class members) before accounting for incentive payments.  Further, the claims here covered less than 3 ½ years, from October 2013 (when Defendants instituted the Distributor model in Connecticut) to the present, approximately half as long as the period for which the Rehberg plaintiffs sought unpaid wages and overtime pay.

In sum., even if there were some merit to the FLSA claims of some class members, the settlement is still fair because the FLSA claims would be relatively small and the average class

---

[19] The North Carolina wage payment law is very similar to the Connecticut statute at issue in this case, as it contains a three-year statute of limitations, allows for double damages unless the defendant proves that it acted in good faith, and prohibits deductions from wages without written consent of the employee. N.C. Gen. Stat. Ann. § 95-25.22.

share in this case is at least $3,500 more than in <u>Rehberg</u>, and <u>Rehberg</u> covered a statute of limitations period that was twice as long as the period covered by this case.  Thus, the proposed settlement in the instant case obviously provides substantial benefit and fair compensation to the participating class members for both their state law and their federal FLSA claims.  All class members have been informed of the <u>Neff</u> case and their rights thereunder, and still 97% of the class members have submitted claim forms to participate in this case indicating that these class members would rather receive a substantial sum now (for many individuals over $25,000) rather than exclude themselves from this settlement, face the uncertainty of continued litigation by obtaining their own counsel to pursue wage deductions claims individually, or to pursue FLSA claims in the District of Vermont.

## IV.    ADDITIONAL CONSIDERATIONS RELATED TO CERTIFICATION OF THE SETTLEMENT CLASS.

In the Preliminary Approval Motion, Plaintiffs explained that the proposed settlement class of "all individuals who entered into a Distributor Agreement, either in their individual capacities or through their own business entities, with Defendants and worked in the State of Connecticut at any time during the from October 1, 2013 to the date of preliminary approval" satisfied all requirements for certification under Rule 23, including the numerosity, commonality, typicality, adequacy, predominance, and superiority elements.  See ECF Doc. 116 at 19-24.  At the hearing, the Court specifically requested that the Parties address "numerosity" and "adequacy" where the proposed settlement class contains less than forty individuals, and the three named Plaintiffs and proposed class representatives are no longer Distributors for Defendants (though at the time of mediation when the settlement was reached, all three individuals were still contracting with Defendants, and Plaintiff Dizinno continued to perform deliveries on a full-time basis).  As set forth below, even though the total number of class

members is slightly less than forty, the "numerosity" requirement is still satisfied, and the named Plaintiffs or additional class members will serve as adequate representatives to the class.

### A.  The Class Satisfies the Numerosity Requirement.

Neither the Supreme Court nor the Second Circuit has declared a strict numerosity threshold. Newberg on Class Actions § 3:12 (5th ed.). "Joinder need not be impossible, nor is there a pre-set numerical threshold for determining 'numerosity.' Rather, the court must look at the class as a whole and assess if 'the difficulty or inconvenience of joining all members of the class make use of the class action appropriate.'" Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 290 (D. Conn. 2009) (quoting Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C., 504 F.3d 229, 244–45 (2d Cir.2007)). When deciding on class certification, then, "[r]elevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." Id. at 936. See also Martin v. Shell Oil Co., 198 F.R.D. 580, 590 (D. Conn. 2000).

These factors weigh in favor of class certification here. The value of judicial economy works in favor of granting class certification to the almost 40-person class. This is especially true because at this stage of the lawsuit, 35 individuals (97% of the class) desire to participate in the case and resolve their claims against Defendants, and failure to certify the class on Numerosity grounds would undoubtedly lead to 35 individualized settlements for each class member (which would still require Court-approval due to the FLSA Claims).

Courts have also been more relaxed about numerosity and more favorable towards granting class certification for cases in the civil rights and employment law context due to

increased probability of retaliation, understanding that not all class members may wish to come forward individually and challenge their employer's (or putative employer's) conduct. See Newberg on Class Actions § 3:12 (5th ed.); Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 86 (S.D.N.Y. 2001) (stating that one of the factors counseling in favor of finding numerosity was the plaintiffs' "fear of reprisals"); Mullen v. Treasure Chest Casino, LLC., 186 F.3d 620, 624 (5th Cir. 1999) (noting that "putative class members were still employed by the Casino [and] might be reluctant to file individually for fear of workplace retaliation" weighed in favor of finding numerosity satisfied).

In addition, the financial resources of the class members weighs in favor of certifying the class. Plaintiffs and class members are delivery drivers, some of whom only worked for Defendants for a short period of time and whose damages are not very large. It is impractical to expect that these individuals would each individually have the resources to obtain his or her own counsel to pursue claims individually in the event that a class is not certified.

Finally, there is nothing unusual about certifying a 36-member class, and a Rule 23 class of this size would be in line with federal court decisions across the country. See, e.g., Bert v. AK Steel Corp., 2006 WL 1071872, *5 (certifying class of 16 unsuccessful minority job applicants); Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452, 463 (E.D. Pa. 1968) ("While 25 is a small number compared to the size of the other classes being considered, it is a large number when compared to a single unit. I see no necessity for encumbering the judicial process with 25 lawsuits, if one will do."); Knight v. Mill-Tel, Inc., 2013 WL 3895341 (D. Kan. July 29, 2013) ("Courts have found that classes as small as twenty members can satisfy the numerosity requirement"); Rex v. Owens ex rel. State of Okl., 585 F.2d 432, 436 (10th Cir. 1978) ("Class actions have been deemed viable in instances where as few as 17 to 20 persons are identified as

the class."); <u>Cypress v. Newport News General and Nonsectarian Hospital Assoc.</u>, 375 F.2d 648, 653 (4th Cir.1967) (certifying class of 18 people); Moore v. Napolitano, 926 F. Supp. 2d 8, 28 (D.D.C. 2013) (certifying class of 27 members) (citing <u>Anderson v. Pa. Dep't of Pub. Welfare</u>, 1 F.Supp.2d 456, 461 (E.D.Pa.1998); <u>Knight v. Lavine</u>, 2013 WL 427880 (E.D. Va. Feb. 4, 2013) (holding that class of 56 people "easily satisfies" numerosity requirement); <u>Kilgo v. Bowman Transp., Inc.</u>, 789 F.2d 859, 878 (11th Cir. 1986) (in disparate impact claims, certifying class with 31 identified members).

**B. The Class Representatives Satisfy the Adequacy Requirement.**

As for the adequacy of the named Plaintiffs to represent the interests of the class, Plaintiffs Bokanoski, Anderson, and Dizinno began working for Defendants from the inception of the "Distributor model" in Connecticut.  All three individuals responded to written discovery, sat for full-day depositions, and were dedicated to seeing this litigation through to the end and obtaining unpaid wages on behalf of their coworkers.  They attended mediation in November 2016, and assisted Plaintiffs' counsel in reaching a settlement that provides substantial monetary and non-monetary benefits to all current and former Distributors, as evidenced by the 97% participation rate.  Shortly after the settlement was reached, the three named Plaintiffs sold their territories back to Defendants (under the same terms available to any other class member).  There is no reason to think that the three named Plaintiffs are inadequate representatives for the class members who remain working for Defendants at the time of final approval.  However, if the Court would prefer that a current Distributor be appointed as a class representative alongside the original named Plaintiffs, class member Javier Lopez is willing to serve in this capacity and he would adequately represent the interests of a potential "sub-class" of drivers who currently work for Defendants at the time of the Final Approval hearing, all of whom have been provided the

option to continue working under the new Distributor Agreement, or to exercise their option to sell their territory back to Defendants.

### V.   THE REQUESTED ATTORNEY'S FEES AND INCENTIVE PAYMENTS ARE REASONABLE.

Finally, the proposed awards of incentive payments and attorney's fees are reasonable. The settlement proposes incentive payments of $20,000 each to Plaintiffs Bokanoski, Anderson, and Dizinno, all of whom initiated this lawsuit on behalf of their co-workers; it was through their initiative that this recovery was eventually obtained. The named plaintiffs provided invaluable assistance to class counsel, including providing documents, responding to discovery, and submitting to lengthy depositions. Furthermore, all three Plaintiffs travelled to a full-day mediation in Boston, Massachusetts that resulted in the settlement.  The incentive payments also provide additional consideration for the named Plaintiffs' execution of a general release (which is not required for other participating class members).  These incentive payments are within the range regularly approved in similar wage and hour cases.  See, e.g., Willix v. Healthfirst, Inc., 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (approving incentive payments of $30,000, $15,000, and $7,500 in wage and hour class action settlement); In re Janney Montgomery Scott LLC Financial Consultant Litigation, 2009 WL 2137224, *12 (E.D.Pa. July 16, 2009) ($20,000 incentive payments in FLSA and Pennsylvania wage and hour case); Torres v. Gristede's Operating Corp., 2010 WL 5507892, at *8 (S.D.N.Y. Dec.21, 2010) aff'd, 519 F. App'x 1 (2d Cir.2013) (finding reasonable service awards of $15,000 to each of 15 named plaintiffs).  One of the reasons for awarding incentive payments in employment cases, including wage and hour cases, is that workers bringing wage claims face the very real threat of retaliation.  As one court has observed: "[Enhancement] awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and

thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." <u>Frank v. Eastman Kodak Co.</u>, 228 F.R.D. 174, 187 (W.D.N.Y. 2005).

Plaintiffs' counsel will request an award of attorneys' fees which will provide them thirty percent of the gross amount recovered under the settlement, i.e., 30% of $1,250,000 ($375,000). Plaintiffs' counsel will also request recovery of litigation costs and expenses from the settlement fund totaling approximately $18,687 (consisting mainly of deposition costs, travel expenses, and mediation fees that Plaintiffs' counsel has already paid). The total request for fees and expenses is for $393,687, approximately 31.5% of the settlement fund. Plaintiffs' counsel is not seeking any costs or fees for the administrative expenses, staff time, and attorneys' time dedicated to administration of the settlement, and performance of all of this work in-house, as opposed to through a third-party administrator, will save thousands of dollars of the class members' funds. (See Lichten Aff., Ex. 2, at ¶¶ 13-17.)

The Second Circuit has endorsed the "percentage-of-the-fund" method for awarding attorney's fees in class action settlements. <u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43, 50 (2d Cir. 2000). "Moreover, the trend in this Circuit is toward the percentage method…." <u>Henry v. Little Mint, Inc.</u>, 2014 WL 2199427, at *12 (S.D.N.Y. May 23, 2014), citing <u>Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 121 (2d Cir.2005). A "request for 33–1/3% of the Settlement Fund is typical in class action settlements in the Second Circuit." <u>Macedonia Church v. Lancaster Hotel, LP</u>, 2011 WL 2360138, at *14 (D. Conn. June 9, 2011) (approving 33-1/3 award of attorney's fees plus additional costs). This method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," <u>In re Lloyd's Am. Trust Fund Litig.</u>, 2002 WL 31663577, at *25. In this

case, Plaintiffs' counsel has proposed a more modest attorney's fee award of 30% of the recovered funds.

In assessing the reasonableness of a fee award, courts in the Second Circuit consider the "Goldberger factors" to ultimately determine the reasonableness of a common fund fee. These factors include include:

> (1) the time and labor expended by counsel;
> (2) the magnitude and complexities of the litigation;
> (3) the risk of the litigation;
> (4) the quality of representation;
> (5) the requested fee in relation to the settlement; and
> (6) public policy considerations.

Goldberger, 209 F.3d at 50.

In total, Plaintiffs' counsel has dedicated **696.9** hours to this litigation.  This time has been spent conducting discovery, reviewing Defendants' substantial document production, attending six depositions, drafting a number of briefs and Motions (e.g, motion for summary judgment, opposition to Defendants' motion for summary judgment, motion to amend, opposition to motion for judgment on the pleadings, and a motion to strike expert witness), undertaking classwide damages analysis, and preparing for and attending two full-day mediation sessions.  The attorneys performing this work, and their normal billing rates, are listed below:

| Attorney | Hours | Normal Rate | Billable Fees |
|---|---|---|---|
| Harold Lichten | 108.7 | $575 | $62,502.50 |
| Matthew Thomson | 411.2 | $275 | $113,080.00 |
| Richard Hayber | 33.4 | $500 | $16,700.00 |
| Erick Diaz | 92.1 | $275 | $25,327.50 |
| Anthony Pantuso | 22.1 | $500 | $11,050.00 |

| Other Associate Attorneys at LLR | 29.4 | $275 | $8,085.00 |
| TOTALS | 696.9 | ---- | $236,745.00 |

(See Lichten Aff., Ex. 2, at ¶ 16.)  Courts in the Second Circuit routinely perform a "lodestar crosscheck" to "serve as a rough indicator of the propriety of a fee request."  Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011).  "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."  Id. at 184 (approving multiplier of 5.2 in employment class action).  Here, the lodestar multiplier is **1.58**.  "Courts regularly award lodestar multipliers from two to six times lodestar."  Johnson v. Brennan, 2011 WL 4357376, at *20 (collecting cases).  Thus, the multiplier in this case is more favorable than the range approved by courts in the Second Circuit.

As for the complexity of this litigation, "[c]ourts have recognized that wage and hour cases involve complex legal issues."  Johnson v. Brennan, 2011 WL 4357376, at *17.  Here, Plaintiffs not only sought to demonstrate their employment status under Connecticut's wage laws and to recover unpaid wages, but they also had to contend with complex issues related to Defendants' FAAAA argument.  The complexity favors an award of the requested fees.

As discussed previously, there was substantial ongoing risk in the litigation, and class counsel undertook to prosecute this action on a contingency fee basis and invested significant time and expense "with the very real possibility of an unsuccessful outcome and no fee of any kind." Johnson v. Brennan, 2011 WL 4357376, at *17.

Class counsel is highly experienced in issues of worker misclassification, wage and hour class actions, and federal preemption of wage claims of workers in the transportation and

delivery industries.[20]   Based in large part on this experience, class counsel was able to obtain a result that will give class members an average recovery of over $22,750, covering a statutory period of less than 3 ½ years.

The requested 30% fee is reasonable in relation to the settlement. "[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement."  In re Indep. Energy Holdings PLC, No. 00 CIV. 6689 (SAS), 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003).  Courts in the Second Circuit have routinely granted requests for one-third of the fund (33 1/3 %) in cases with settlement funds similar to and larger than this case.  Johnson v. Brennan, 2011 WL 4357376, at *19 (collecting cases); see also Macedonia Church v. Lancaster Hotel, LP, 2011 WL 2360138, at *14 (D. Conn. June 9, 2011) (approving 33-1/3 award of attorney's fees plus additional costs).

Public policy considerations also support the proposed fee award.  Awarding a "percentage of the fund" fee of thirty percent recognizes and encourages the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees.  Unlike traditional firms that receive hourly fees on a monthly basis, plaintiffs' attorneys who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, document production, and so forth), without ever receiving any ongoing payment for their work.  Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees.  See, e.g., Hensley, 461 U.S. at 448  (noting that "[a]ttorneys who take cases on contingency, thus deferring

---

[20] Plaintiffs' counsel's experience and expertise in the employment law are discussed in greater detail in the Affidavits attached hereto as Exhibit 2 and Exhibit 7.

payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate").  For that reason, courts have routinely approved one-third fee awards in class settlements, recognizing "the attorneys' fees requested [are] entirely contingent upon success.  Proposed Class Counsel risk[s] time and effort and advance[s] costs and expenses, with no ultimate guarantee of compensation."  Macedonia Church, 2011 WL 2360138, at *14.

By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them.  That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case.  It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979) (addressing anti-trust laws).

## CONCLUSION

Plaintiffs request that the Court enter the Order attached hereto as Exhibit 1.

Respectfully Submitted,

Plaintiffs, BART BOKANOSKI, ROBERT DIZINNO, and JEREMY ANDERSON, on behalf of themselves and all others similarly situated,


By: _/s/  Harold Lichten_____
Harold L. Lichten
Admitted *pro hac vice*
Matthew W. Thomson
Admitted *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
hlichten@llrlaw.com
mthomson@llrlaw.com

Richard E. Hayber, #ct11629
The Hayber Law Firm, LLC
221 Main Street, Suite 502
Hartford, CT  06106
Tel:  (860) 522-8888
Fax: (860) 218-9555
rhayber@hayberlawfirm.com

## <u>CERTIFICATION</u>

I hereby certify that on March 7, 2017, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.

<i>/s/ Harold Lichten</i>